Good morning. May it please the Court, Mike Rayfield on behalf of Walter Coto Ortiz, who's in the courtroom with me today. The order of removal entered against Mr. Ortiz would likely be a death sentence for him if it's carried out. The government doesn't dispute that if Mr. Ortiz is removed to Honduras, he will more likely than not face severe pain and suffering at the hands of Honduran gangs. Mr. Ortiz's family, seven members of his family, suffered brutal torture at the hands of gangs in Honduras after his brother attempted to leave MS-13. And the evidence in the case shows that Mr. Ortiz's own former gang membership and associated tattoos would make him a walking target for torture from Honduran gangs, police, and social cleansing groups. Now because the government doesn't dispute our showing as to the first cat prong, at least with respect to with respect to gangs, I'd like to focus on the acquiescence requirement of the cat, if that's all right with the Court. Two main categories of evidence compel the conclusion that public officials would not only acquiesce in Mr. Ortiz's torture, but actively participate in it. The first is evidence that police generally don't protect citizens from gang violence in Honduras and often collude in it. The BIA recognized that there is widespread corruption and collusion with gangs among the police. That's an AR-8. This Court said the same thing in Colvi-Holder, a decision in 2011 based on State Department human rights reports that had been submitted at that time. And according to the country report that was submitted in this case from 2015, nothing meaningful has changed. Gangs in Honduras continue to have, quote, widespread impunity, according to the country report. And there is still, quote, corruption and impunity within the security forces in Honduras. That's AR-592 and 601. So that's the country report. So there was also some evidence that the government made some efforts, even if not very effectively. What do we do with that in terms of understanding acquiescence? Two responses to that. So the BIA did find that the government had taken some steps to address the problem of gang violence and corruption in the police forces. But that's insufficient for two reasons. First of all, it's irreconcilable with this Court's decision in Madrigal v. Holder, which holds that the question under the acquiescence prong is whether the government has the ability to root out gang violence and police corruption, not its mere willingness to do so. And the government has conceded in this case that the Honduran governments have been, quote, mostly ineffective. That's page 33 of the government's brief. Now, we think that that should really end the discussion under Madrigal. But even if the Court were to focus just on the willingness of the Honduran government to root out these problems, the outcome should be the same. Because even if the government is shifting away from the Monodura policies and some of the heavy-handed tactics at the national level, at the local level, nothing meaningful has changed. Police continue to both turn a blind eye towards and collude with gang members. And worse yet, police officers are continuing to actively go out and torture former or suspected gang members themselves. So if we agree with you that Madrigal tells us that the agency erred here in the acquiescence question, should we remand for the BIA to reconsider like we did in Madrigal? Or should we actually order cat relief to be granted, which is what you're requesting? So we don't think a remand is necessary here because although the BIA did make this legal error, both the IJ and the BIA appear to have fully considered the evidence. And any view of the evidence, in our view at least, would compel the conclusion opposite to the one that the BIA reached. So remand would be a waste of time in essence? I don't know about a waste of time. I wouldn't say that. But I don't think a remand is necessary because the record has been fully developed. The agency has fully considered the evidence. It's just reached a conclusion that is contrary to what the record compels. Could you talk about Nasrallah? Sure, I'm happy to. So the Supreme Court, as you know, granted certain Nasrallah to decide whether the courts of appeals possess jurisdiction to review factual findings underlying the denials of withholding and deferral of removal. Now, in doing so, it decided to address a circuit split on which this Court is clearly on one side of it. This Court has held since the Lemus v. Mukasey case in 2008 that the Supreme Court does have jurisdiction to review the factual findings underlying a cat determination under 1252's jurisdictional bar doesn't foreclose jurisdiction in that respect. So as of now, everyone agrees that this Court's precedents are clear. This Court has jurisdiction under its precedents over the last 10 years to decide this issue. Now, if the Court is asking me whether it should await the Supreme Court's decision, I don't think that's necessary. This case is fully briefed. It is — this Court's precedents are clear on what the Court can do here. And the grant of cert in itself is not an indication one way or the other that the Supreme Court is going to decide this differently. We think the Supreme Court is going to come out in — on the side of — on what we think is the right side, on this — on the side of this Court's precedents. And the fact that granted cert in a case where — that it come on the other side, if anything, suggests that it's leaning towards this Court's — Do you understand — so I've had trouble understanding even what the Supreme Court is going to be thinking about in this realm. So it seems like there's a question maybe of whether you can't challenge factual determinations in the sense of if the agency said the person's from this part of the country and actually you want to say they're from that part of the country, you can't contest that fact in this type of proceeding? Or is it you can't challenge the overall application of the law to fact, which is what our Court allows primarily? So I don't quite even understand the cert grant, what the question presented is in this realm. Well, if you look at what the Eleventh Circuit held in Nasrallah, I think it's what the Court — what Your Honor said last, which is the Court — Application of law to fact. Yeah. The Court appears to be trying to decide the issue of whether it can review the BIA's determination as to the likelihood of torture. And acquiescence. And acquiescence. Correct. Yes. The 50 — whether you've met the 50 percent threshold or not. So what happens if we wait and the Supreme Court says, you don't have jurisdiction to make that decision? Well, in that case — I mean, in that case, we would ask for supplemental briefing because as Judge Friedland pointed out, we also have a legal argument here that wouldn't be affected by the Supreme Court's decision. Our position — the Supreme Court, even if it comes out on the other side of the circuit split, would only be — that decision would be limited to from resolving issues of law underlying a — underlying a CAT finding pursuant to 1252 subsection D. And what would the issue of law be here, separate from determining whether the facts are, as you say, or as the BIA and the IJ characterize them? The issue of law, in our view, is that the BIA erred in holding that mere steps towards towards deciding the — towards resolving the problem are enough under the CAT acquiescence prong. That decision is a — it depends on the legal definition of acquiescence. Would you say that again? I'm sorry. Sure. The legal question is whether the BIA erred in determining that under the acquiescence prong of CAT, as a matter of law, that take — that the fact that the Honduran government has merely taken steps towards resolving the problem is enough under the acquiescence prong. That — I'm sorry. Go ahead. Yeah, I didn't mean to interrupt you. Keep — please, finish your sentence. That — that does present a legal question, because it goes to the definition of acquiescence. And this Court held in Madrigal that the BIA had made a legal error in — in deciding that what mattered was the willingness of the government to address the problem and not the ability. So even if this — even if the Supreme Court comes out against this Court in — in Nasrallah, we would still ask for supplemental briefing to at least address the — sorry. Go ahead, Jen. I'm having trouble distinguishing your framing of the question from the intertwined finding that under these facts, the Honduran government may have the willingness or express a effort to take steps to combat reprisals against former gang members, for example, but can't do it. The — it's the can't do it here prong of that that seems to me to be intertwined with factual findings that Nasrallah would nonetheless impact. Can you address my concern? I — I don't — I — It wasn't a well-framed question. I'm sorry for that. It was perfectly well-framed. I — I respectfully disagree with that, because the — the issue that would remain after Nasrallah is even if you take the facts as true, even if the steps to address the problem. There's a legal question of whether that in itself satisfied — satisfies the acquiescence rule. I understand that. But in order to grant relief, we would then have to — there would then have to be a second and underlying factual finding, which is that in this case, they were willing but unable. And doesn't that — I am still concerned about that being dependent on finding certain facts, which are his relationship to his brother, the likely torturer's knowledge of his relationship, the placement of his gang tattoos and why that wouldn't prevent them from being detected. I mean, all of those are very specific. The history of the violence against seven members of his family, all of those are very fact-dependent. And if we don't have jurisdiction to — unless what you're saying is that nobody challenged those facts. That's correct. First of all, in our situation, we think the government and the BIA didn't even make a finding against him as to cat prong — as to cat prong one, at least with respect to gang membership. So that's undisputed. Now, Your Honor, I think that leaves the question of the acquiescence prong. There's no question about that. If the court were to await Nasrallah and Nasrallah came out on the other side of the issue, I do think that at that point, you wouldn't allow — you wouldn't be allowed — not allowed — you wouldn't be able to grant the primary relief I'm seeking, which is pure cat relief. At that point, there would be — the only way to remand to the BIA would be to address this error of law, at which point the BIA would have to make new factual findings under the willingness versus ability test. So on that argument, it seems like if we were to decide things now — so say we agreed with you entirely. If we did that now, that might be subject to a Nasrallah problem if the court goes the way you don't want in Nasrallah. But maybe if we now remanded for a correct — because this legal error was made, we'd not have to worry about Nasrallah? Is that your position? Like, we could go ahead now and remand to the BIA on the Madrigal error? MR. CLEMENT I think you could do that, but at least under the current state of the law, we would — we would ask that you — that you'd simply direct the BIA to grant — to grant deferral of removal under the CAT. It — granted that might — that decision may, in fact, be impacted by Nasrallah somewhere — somewhere down the line, but I don't think — just because the court has granted certain on this issue, I don't think that means this court has to wait. The — the — the — this issue is — is — has been fully briefed and ripe for this court's determination under its existing precedence, and so, you know, I'm not — I'm not going to be presumptive about how the court should handle its own docket, but — but I do think that it's — it would be appropriate to — it — it — there's — it — there's no need to await Nasrallah to decide this question, and I would like to save a little bit of time for rebuttal, if that's all right. Thank you. Thank you. Thank you. All right. Good morning. May it please the Court. Elizabeth Chapman for the respondent. In this case, the immigration judge gave extensive and careful consideration to all of the record evidence, applied the correct legal standards, and determined that the evidence did not demonstrate that the petitioner more likely than not would be tortured in Honduras by the government or the government's consent or acquiescence. The record supports the petitioner's and does not compel a contrary conclusion. Step back a little. I thought I would go ahead and speak to Nasrallah as well, since that was the court's inquiry, and the petitioner — petitioner's counsel described the issue here, what the circuit split is about. We have the Seventh Circuit and the Ninth Circuit finding jurisdiction for two separate reasons, and then the remainder of the circuit's finding no jurisdiction. And in this case, the government doesn't have any opposition. If the court would like to wait to see whether or not the Supreme Court finds that there is jurisdiction in a case like this. How would that make a difference here? In other words, if you could respond to the argument that there's a legal error and the facts that would lead to the correct application of the law to those facts are undisputed, so we can grant relief now, even if Nasrallah were to come out, no, you can't review factual findings. Well, you could certainly make a determination onto the issue of whether or not the petitioner demonstrated he more likely than not would be tortured in Honduras, and the government doesn't concede that he would be tortured. I think that petitioner's counsel — I understand you don't concede it, but I guess it's analogous to a summary judgment review. That is, if the facts that bear on the right, then as a matter of law, a certain result occurs without any need to review those facts. I guess the question is, can we determine that the facts are undisputed without reviewing those facts in a way that would be impacted by Nasrallah? I'm sorry, can you repeat the question? Yeah, that's a good question. So I think that if I understood the petitioner correctly, the argument is the pertinent facts are so clearly laid out in the record, they are undisputed. Right, we don't need to remand to have a re-exploration of facts. And if we don't have — so I guess my question is, based on the uncertainty of how broadly Nasrallah might be framed, but if the Supreme Court were to hold a broad, no-jurisdiction, to get into the facts court, would that prevent us from assessing that the facts are undisputed? Well, the court wouldn't have jurisdiction to determine whether or not the agency correctly denied cat. So if the facts are what they are, it would just be that there's no jurisdiction to review the denial of cat protection. There would only be jurisdiction to review legal or jurisdictional claims. If we find an error in the legal claim, would Nasrallah nonetheless require us to remand or decline to do anything more? That is, we'd have to send it back to the agency to say, these facts are or not enough. No, I mean, if there's a legal issue, the court can certainly decide the legal issue. We could do that. I understand that. But I guess the question is, does the threat of Nasrallah saying no jurisdiction deprive us of the ability to characterize the factual findings in a way that would be needed to grant relief under the correct legal standard? And if I'm not being clear, I apologize. No, I'm just trying to understand — It's a sort of a circular problem. Yeah, I mean, if the Supreme Court in Nasrallah finds that there's no jurisdiction, that 1252A2C deprives the court of jurisdiction, then what the court — To review factual findings. To review factual findings. Then, correct. They're always going to have the jurisdiction to review legal and constitutional issues. Then the court would not be able to say, substantial evidence does not support the denial of cat protection. What the court would have jurisdiction to determine is any legal issues. The legal issues would be two legal issues here. One is the definition, I suppose, of acquiescence, which I don't think that there is a legal problem here. I think that the court acknowledged Madrigal. Madrigal is acknowledged, and I think that Madrigal was applied properly here. What Petitioner seems to be claiming is that under Madrigal, so long as you can show any evidence of police corruption, that's sufficient. But Madrigal doesn't go so far as to show that — as to hold that any evidence of police corruption or collusion is sufficient to show acquiescence. Under Madrigal, a petitioner still needs to demonstrate that he more likely than not — any torture that he more likely than not would suffer would occur by the government or the government's consent or acquiescence. And in our brief, we cite to a case which is Cordova v. Holder. And in that case, the court looked at the evidence and said 90 percent of the police force — in that case, it was Mexico — 90 percent of the police force is acting in collusion with the gangs. So there, it's more likely than not that any torture that the petitioner would suffer was by or with the acquiescence of the police. And under Madrigal, what they're saying is that if the police, so at the low level, not necessarily the entire federal government, but if you could show that some form of the government is going to acquiesce to torture, that's sufficient. Here in this case, we don't have 90 percent. The petitioner's expert witness, Dr. Borman, he testified that it was 40 percent of the police force. And that's on 976 of the administrative record. That 40 percent of the police force has gang connections, is colluding or corrupting, is in collusion with the gangs. Okay. If you were to be told that 40 percent of the greater Los Angeles police force would likely acquiesce in the torture of select people, targeted people, would you find that acceptable? That seems to me to be — I mean, percentages are meaningless to the people who are outside of them and mean everything to the people who are inside of them. But 40 percent? I understand that. I'm not saying that's not a large number. It's much larger than it should be. But it's not more likely than not. And that's what the standard is more likely than not. So you still have to demonstrate. So he needed 11 percent more? If we're looking at 51 percent, then yes. You'd still have 60 percent of the police force that's not in collusion with the gangs. So if the standard is the petitioner has to show that he more likely than not would face torture by the police, by the government, 40 percent, it's still a high number. I'm not discounting that. Is that a legal question or is that a 40 percent and that's not enough? 40 percent seems to me to be factual in nature. Yeah. And that's why I'm saying I don't see that there is a legal issue here as to whether or not there's been acquiescence, whether or not the petitioner has demonstrated acquiescence. To me, that seems to be a factual question. But why isn't petitioner correct that the BIA contradicted Madrigal's assessment that the BIA erred by focusing only on the Mexican government's willingness to control the gang, not its ability to do so? I mean, isn't that exactly what the agency did here? Talk about, well, they're trying and it doesn't matter if they're succeeding, but just because they're trying, that's enough. Doesn't Madrigal tell us that's not correct? Well, there's there's been some blurring between this unable and unwilling standard and acquiescence. Those are actually two different standards. Unable and unwilling comes from asylum and withholding of removal. With asylum withholding removal, the standard is the petitioner needs to demonstrate a well-founded fear of persecution by the government, by somebody the government is unwilling or unable to protect. Cap protection is a higher standard. It's not unable or unwilling. It actually requires state action. So the standard there is state action. It's by the government or the government's acquiescence, which is why we have cases subsequent to Madrigal, Garcia Millan, where they say just because the government, where the government is taking action and the government is trying to root out corruption and trying to stop gang violence, just because they're not entirely successful, that does not demonstrate acquiescence. This court has held that in several, in Garcia Millan, also in in Chavez v. Sessions. This court has acknowledged post-Madrigal that just because a government is not entirely successful in rooting out corruption and ending the gang problems, that's not sufficient to demonstrate acquiescence. And that's because the standards are separate. So acquiescence would include, though, awareness that it's happening and just looking the other way, right? Exactly. But that's not what we have here. We don't have willful blindness, looking the other way, banging your head in the sand. The government is taking actions. They're not entirely successful, but they are taking actions and trying to end corruption. Well, it seems like part of the problem is we've got like a national government issue and a local government issue. So the 40 percent number is local, right? Exactly. So and the 40 percent is people who government government officials who are actually helping, not just looking the other way. Right. It's some sort of connection is what Dr. Borman said. It's people who have some sort of it was all but inevitable that the petitioner would be targeted, the petitioner would be subjected to violence, torture, and that there would be a lack of assistance from government sources at a minimum. Inevitable in the total or just by the gangs? I don't recall. Perhaps there would be. I'm sure it's in the record as to his testimony, but clearly he testified that in his view, the petitioner was an inevitable target and would be tortured. Dr. Borman did testify to that. By the gangs. By the gangs. Correct. And the issue then becomes whether or not there's state action. Well, looking the other way versus more active participation. Right. And looking the other way does count as acquiescence. Right. But trying to do what you can to root out the violence and end the violence and root out corruption and end corruption, but not being entirely successful. That's not the same as looking the other way. But that's taking action. And that's under Garcia Milan. But if the national government is taking some action, but ineffectively, and the local people have 40 percent who are helping and everyone else looking the other way because we know there's a huge problem, then why isn't that? Well, we don't know that the remaining 60 percent is looking the other way to the 40 percent. Well, but we do know that somehow seven members of his family had previously been subject to some pretty horrific sounding acts. But we also don't know. We do know that they didn't report that to the police, and we don't know that the police was acquiescing there. We don't know that there's any police acquiescence in the torture and the horrific acts that occurred to his family. Does it have to, does, under the Convention Against Torture, does the torture or the likelihood of torture have to be at the hands of the national government? No. It has to be by a government actor. And that's what Madrigal is saying. But it doesn't have to be the entire government, so long as you could show that some government actors, but you still have the more likely than not standard. That doesn't go away under Madrigal. Didn't the, I'm having trouble understanding what the board did. It says, however, in light of the mixed record of government collusion and gang violence, namely the evidence that the Honduran government has taken steps to curb gang violence and corruption, albeit not entirely successful, and testimony from the applicant's expert that it was uncertain whether the applicant would be tortured by Honduran authorities upon his return, the immigration judge found it was not more likely than not that a Honduran public official or an official acting in an official capacity, individual acting in an official capacity, would acquiesce in his being tortured. That sounds like what they're talking about has to be national. No, I mean, right after the words, they quote that they don't need to show that the entire foreign government would consent or acquiesce to the torture, so long as they show that a public official would so acquiesce. So they recognize that's the specific standard in Madrigal, that it doesn't have to be the entire national government, so long as a public official. The board acknowledged that and engaged in the analysis and just found that in this case, the record wasn't sufficient to show sufficient acquiescence. I guess I'm having trouble, and again, this assumes jurisdiction perhaps to review factual findings. I'm having trouble with equating your insistence that 51% of the police force locally has to be corrupt enough to acquiesce, to find that it was established by a preponderance that this gentleman, that there would be one police officer who would be enough. Well, no, what I'm saying- Because he was so likely to be targeted. What I'm saying is even under Madrigal, you still have to show more likely than not. And I understand, but I'm- Go away, that's the standard for counter protection. I'm not disagreeing with you at all. I'm having trouble equating, it has to be 51% rather than 40% overall of the police force locally that might be corrupt in order to reach that finding, as to a particular individual without regard to his specific background, his family background, his prior connection to gang members who have left gangs, all of those factors that we do have here. Sure. No, I mean, I see what you're saying. I don't see that 51% tracks that. No, I see what you're saying. What I'm using that 40% number is, is to clarify. You would have to show, if you're going to just base general corruption in the police force and say that that is sufficient to show that the petitioner is going to be tortured by the gangs. I don't think this record does that. I think it goes beyond and says, here's why he is specifically likely to- specifically is going to acquiesce in his torture. And that's the key here with cap protection is that it requires state action. Well, I understand, but one police officer is enough. Right. And that's what you have in Barajas Romero. You do have one police officer, but there it's more likely than not that that police officer, there was the police officers that were actually doing the torture. Well, I understand that. And we don't have that here because- Right. You hadn't had the chance yet. But the question is, is there a likelihood? And I don't know that you have to find that over half the police force is corrupt in order to make that finding when you have specific faxes to the specific petitioner. But we don't have specific facts that the police have colluded in the torture of Stanley. I understand your argument. Can I go back just a moment to Nasrallah? Yeah. So the government's position with respect to Nasrallah and the Supreme Court is what? That there would not be jurisdiction over the agency's determination that the petitioner did not meet his burden for cap protection. And does that mean there's no jurisdiction to review anything? No, there's still jurisdiction to review constitutional issues and legal issues. So another legal issue that the petitioner presented here is whether evidence of past torture is sufficient to demonstrate future torture. That would be a legal issue. That sounds factual. But I don't know whether it creates a rebuttable presumption. In a brief, the petitioner said that the evidence of past harm to his family creates a presumption of future torture. That's a legal issue is whether it creates that rebuttable presumption. And the government's position there is that it doesn't. Well, the factual finding hasn't been rebutted here. The factual finding of past harm? Oh, right. There's no factual rebuttal that, yes, his family has been harmed. That's not in doubt. Well, so if we were to hold that the BIA erred as a matter of law in saying that there was not more likely than not that he would face torture on the basis of the government's steps to torture at the hands of the government because of the government's steps to stop gang violence, would that be a legal conclusion? To me, that sounds factual. To me, that sounds like a factual. You're replying the facts to the law. The legal issue is whether the standard for acquiescence was incorrect. But I believe it was correct here. Couldn't you say it's a legal error to assume that any steps taken anywhere in the country preclude acquiescence? Sure. You could equally say it's a legal error to assume that any sort of corruption by the government at any level is sufficient to demonstrate acquiescence. And if we were to hold that, it would not be affected by Nasrallah one way or the other. It would not. So you disagree. But if we think that there is some kind of madrigal error here legally because of how the agency considered what counts as acquiescence, then we could go ahead and decide that and we don't need to worry about Nasrallah? Yes. If it's a pure legal question, if it's a pure question as to what is the definition of acquiescence, that doesn't matter what the facts are. You could apply any facts. But it's your position that we can't order the grant of cat relief in any way because that would have to fundamentally butt up against Nasrallah no matter how we cut it? I mean, if you went ahead and granted cat relief and then the Supreme Court, Nasrallah determines there's no jurisdiction, I believe the government would file a motion for rehearing. And it seems like that would be a waste of judicial resources if you could just wait until Nasrallah. So is with the government, so I think if I've counted correctly, just our panel this week has six cases that implicate Nasrallah. Is it the government's position that we should hold them all? And as a court, we should hold all of these cases just all year? Even if we were to deny relief in a different case? No, I mean, I think the court can do what the court would like to do. If the court wants to hold them, that's fine. Just knowing that jurisdiction might be stripped and then these cases would have to be reopened or readdressed. And maybe you're the wrong person to ask. Yeah, probably. If we denied relief. I'm sorry, if you denied? Decided that in a given case, and perhaps this one, relief should be denied. Yes. And Nasrallah says you don't have jurisdiction to decide it. And the BIA had said no relief. Would our decision to deny have implications for what other avenues might be pursued to seek the ability not to be removed? For this petitioner? Assuming he was to be denied. I don't think he has any other avenues because of his crimes. I don't think that there are any other avenues. He has an aggravated felony conviction. So I think that this is the only relief. So I don't think there is. So do you know if the government has a position on whether our court should hold all these cases or decide these cases or what we should do at this point? No, I don't. But if we were denied to deny relief, that would be the end of the case. Yeah, I mean, I suppose the government can file a hearing for reopening, but they wouldn't. If we don't have jurisdiction, it's not going to change anything. Right. But is it your position that we could write a decision here denying relief on the merits, even though your position in Nasrallah is we don't have jurisdiction to do that? Well, sure. Up until Nasrallah is decided, the court does have jurisdiction. Because that's the law. Because that's right. That's the law of the circuit. That's his president. And actually, now that I mean, I did run the court's inquiry from last week saying that you wanted to discuss Nasrallah by the office. If it were the office's position to hold all the cases, I would have been told to hold it. So I know that our office is not asking for cases to be held in light of Nasrallah. And Maine Justice has given no general nationally applicable marching orders? No. Thank you. Thank you. So you have some time for rebuttal. Thank you. So just a few responses to that. Just briefly on Nasrallah, I disagree with my colleague that if the court lacks jurisdiction, it could not deny relief or grant relief. So it has to be one or the other. If the court is inclined to wait for Nasrallah, then... If we denied relief in your case, and please don't read anything into it. If we denied relief and Nasrallah says you don't have jurisdiction to review factual findings, in these kinds of cases, does your client have any avenues that are negatively impacted by the decision we took? Not that I'm aware of, no, Your Honor. Either way, your client would lose. Right. That's right. Assuming that the court finds no legal error, denies relief, and then yes, that's correct. I do want to say that I think I may have been a little bit overly certain about what the issue is going to be decided in Nasrallah. And I think maybe I came out on too strong on that. I think it's not necessarily the case that the court is going to decide that the ultimate factual determination of whether there's a greater than likelihood of 50% chance of torture is a factual question that's not reviewable. So I think that although that is what the 11th Circuit held, it's not necessarily what the court is going to decide. It's still possible that the court could make a distinction between the underlying facts, you know, what happened, who was tortured, you know, who was beat up and when, and the application of the CAT standard to whether there's a greater than 50% chance likelihood. I'm sorry if I was unclear on that. So what we don't know is what impact the court's decision, however broadly it frames it, will be on those favorite candidates for judicial review, mixed questions of law and fact. Yes. And in fact, I believe there are a few cases up at the Supreme Court now that are grappling with the question of what constitutes a mixed question of law and fact. In this context. Well, right. A mixed question of law and fact means that it's got questions of law and questions of fact. And the problem is which is which. Right. Yes. And we always have jurisdiction to determine jurisdictions and how does that run up against figuring out what's law and what's fact and how far that lets us roam. We don't know that until Nasrallah tells us, at least with some more clarity than we know from this, the grand absurd. But if we agree with you that there is an error here of law by the BIA, then you win. That's correct. And I don't think anyone would say that that would be impacted by Nasrallah. And maybe that is the course I should be advocating for. But that only gets you a remand, right? That does only get us a remand. Yeah. I would prefer, under this court's existing precedence, a finding that the record compels a conclusion contrary to what the BIA found. That's what I think would be best for my client. I understand if the court is concerned that that might be affected by Nasrallah eventually. And I see I'm out of time, but would it be okay if I just briefly address the 40% issue? So what the record shows, as the government points out, is that 40% of public officials are colluding and participating with gang members. Now, the fact that that's less than 50% is irrelevant. The question is not whether over 50% of public officials are corrupt. The question is whether it is more likely than not that a public official would acquiesce in his torture. Of this guy. Of this guy. And if 40% of public officials are actively participating, then certainly it's reasonable to infer that there's more than 50% that someone is going to acquiesce in his torture. That would be our position. And that's because of the history of his family and gangs so far? Yes. And that doesn't even take into account the police. Or is it because of his tattoos? What would get you from 40% to more for him in particular? All of these things. His family history. The fact that his family has connections to MS-13. His tattoos. The fact that when he goes... The first thing that's going to happen to him when he goes to the board if he's removed is that the police are going to likely strip off his clothes, check him for tattoos, figure out that he's a gang member, and then possibly report that information to other gangs in Honduras. And that 40% figure, by the way, doesn't even take into account the police officers that are not colluding with gangs but are actively going out and torturing suspected gang members. It's important to keep in mind that there are two groups of police here who are likely to acquiesce in Mr. Ortiz's torture. One is the group that is turning a blind eye when gangs commit violence against other citizens, either because they're terrified of the gangs or in collusion with them. The other category is the police that are actually going out and committing acts of torture themselves, either pursuant to this Monodura policy or because they're involved in one of these clandestine social cleansing groups that are committing an average of three extrajudicial killings per day. But certainly when you take those things together and when you have gang members going after other gang members, that is the situation where somebody is least likely to be able to turn to the police. They can't turn to the police that are colluding with gangs, and they can't turn to the police that would make things worse by actively torturing them. And I'm sorry, I'm out of time. So if the court doesn't have any more questions, we ask the court to grant the petition. Thank you. Thank you. Thank you for participating in our program. That was what I was just going to say, too. Thank you for being pro bono counsel. We really appreciate it. It helps the court tremendously.
judges: Schroeder, Friedland, Rosenthal